IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 23, 2012

## STATE OF TENNESSEE v. RODNEY K. GLOVER

**Appeal from the Circuit Court for Montgomery County**
**No. 40900017      Michael R. Jones, Judge**

_____

**No. M2011-00854-CCA-R3-CD - Filed March 28, 2012**

_____

A Montgomery County Circuit Court jury convicted the defendant, Rodney K. Glover, of conspiracy to commit aggravated burglary, aggravated burglary, conspiracy to commit theft of property valued at over $10,000 but less than $60,000, aggravated robbery, aggravated kidnapping, and theft of property valued at less than $500. At sentencing, the trial court imposed a total effective sentence of 50 years' incarceration. On appeal, the defendant challenges the trial court's imposition of sentences as to both the length and alignment of service. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and JEFFREY S. BIVINS, JJ., joined.

Daniel A. Stephenson, Clarksville, Tennessee, for the appellant, Rodney K. Glover.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Robert J. Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On October 16, 2008, Vickie Terrell went to the home of then 90-year-old Oma England, where Ms. Terrell was employed as a part-time caregiver for Ms. England. She arrived at approximately 8:00 in the morning to take Ms. England to a 9:00 appointment. Upon her arrival, Ms. Terrell was immediately "alerted" that something was wrong because the garage door was still down, which was unusual because Ms. England routinely opened the door when expecting Ms. Terrell. Ms. Terrell also noticed a screen removed from a garage window and a bench knocked over near the garage. Once she entered the garage, Ms.

Terrell saw that Ms. England's 2006 Mercury Milan was gone and that several items littered the garage floor. Ms. Terrell opened the door to the home and, without stepping inside, she could see the house was "disordered." She called the victim's name twice and "backed out" of the home to telephone the Clarksville Police Department (CPD).

Officer Ben Blackmon responded to Ms. Terrell's call. He entered the home to make sure no one was inside. He noted that the home was in "extreme disarray" with furniture turned over, pictures removed from the walls, drawers pulled out, and paperwork scattered on the floor. Officer Blackmon searched the basement and main level floors before going upstairs. Each room had "stuff thrown all over" the floor. As he entered an upstairs bedroom, Officer Blackmon saw a body lying on a bed. The body was completely covered except for the feet. When Officer Blackmon saw one of the feet move, he immediately entered the room to "render aid." Officer Blackmon identified the person on the bed as the victim, Ms. England. The victim's feet and hands were bound to the bed with electrical cords. Officer Blackmon cut the electrical cords in order to release the victim. The victim told Officer Blackmon that she needed water and a doctor. Emergency medical technicians soon arrived and transported Ms. England to the hospital.

Doctor Robert Paasche, an emergency room physician with Gateway Medical Center at the time of the victim's assault, treated the victim when she arrived at the hospital. He described the victim as "an elderly woman who had been beaten quite severely." The victim suffered "intensive bruising and swelling about both eyes and the face." She was unable to open her eyes. She also experienced tenderness and bruising to the left side of her chest, bruising and swelling to her forearms and wrists, and a "skin tear" on her left arm. The victim suffered "quite a bit of pain" from fractures to bones in her face and hands. Doctor Paasche determined that the victim had been tied to the bed for an "extended period of time." Doctor Paasche ran tests to determine the victim's "skeletal muscle enzyme level." He explained that a normal enzyme level is 100. His testing revealed that the victim's enzyme level, however, reached 1,700, indicating that the victim had lain in the same position for ten to 12 hours. At that level, the victim was at an increased risk for kidney failure.

CPD officers "processed" the victim's home in the days following the assault. All of the officers described the home as "totally ransacked." From the home, they collected latex gloves, the electrical cords used to bind the victim, and a pillowcase that had been placed over the victim's head. Several days later, Ms. Terrell found a "cigarette butt" in a corner of the foyer while she helped the victim's daughter, Nancy Williams, clean the home. Knowing that no one smoked in the home, Ms. Terrell gave the partially-smoked cigarette to Ms. Williams who then gave it to Sergeant Liane Wilson.

Within days of the assault, another CPD investigator, Detective Brad Crowe, received a telephone call concerning a suspected stolen vehicle found abandoned at a local used car lot. Detective Crowe collected more partially-smoked cigarettes and a Pepsi bottle from the abandoned Ford F-250. He also found a business card for Accurate Welding and Ornamental Iron, a Georgia business, behind the front seat of the truck. Testing performed at the Tennessee Bureau of Investigation Crime Laboratory later confirmed the presence of the defendant's and co-defendant Colin Savage's fingerprints and deoxyribonucleic acid (DNA) on several items collected from the victim's residence and the truck.

Detective Timothy Finley determined that the license plate on the abandoned truck had been stolen from a vehicle in a local Walmart parking lot. Through a trace of the truck's vehicle identification number, Detective Finley also determined that the truck belonged to the owner of Accurate Welding and Ornamental Iron, who had reported the truck stolen. The victim's car was later found in Georgia. The defendant became a suspect following interviews with the victim's stepson-in-law, John Privette. When Detective Finley learned that the stolen truck originated from Jonesboro, where the defendant also lived, the investigators "became real interested in" the defendant as a suspect.

On November 8, 2008, Detective Finley received a letter from the defendant implicating Mr. Savage as a co-participant in the offenses. In the letter, the defendant also disclosed the location of many stolen items. Investigators located the items on property owned by Mr. Savage's mother and at a neighbor's home where the defendant had stayed. Investigators found jewelry, purses, coin sets, scarves, and flatware belonging to the victim at both residences. They also discovered a black nightstick in the family room of the home where the defendant was staying. Telephone records revealed that someone telephoned Mr. Savage's cellular telephone from the victim's residence at 10:36 p.m. on October 15 and again at 2:12 a.m. on October 16. Investigators also learned that the victim, who had a subscription to "Lifeline," an emergency service, received a call from the service at 11:41 p.m. on October 15.

Nancy Williams, the victim's daughter, testified that her father, Maurice Coursey, died more than 15 years ago and that the victim later married George England. Mr. England had two children, George and Nancy. Mr. England's daughter, Nancy, was married to John Privette. Mr. England died in February 2008, and the victim was living alone at the time of the offenses. Ms. Williams lived in Baton Rouge, Lousisiana but visited the victim three or four times a year. The Terrells worked for the victim, doing household chores and maintenance and driving the victim to appointments.

Ms. Williams recalled when the offenses occurred. She said she flew straight to Clarksville upon learning of the victim's assault. The victim spent one week in the

hospital and several more in a rehabilitation center. Ms. Williams described the victim's home as a "total wreck." Ms. Williams recalled Ms. Terrell's finding a partially-smoked cigarette as they cleaned the victim's home. She gave the cigarette to Sergeant Wilson. Ms. Williams recalled that a blue aquamarine necklace purchased by her father in 1948 for her mother was among the items stolen. The victim's assailants also took Mr. England's West Point ring, a large diamond ring, an "elaborate gold bracelet," and a mink coat, as well as the victim's car. The insurance value of the items totaled between $15,000 and $20,000.

The victim, Oma Nell Woodson Coursey England, testified that she was born on March 26, 1918. She recalled being assaulted as she lay asleep in bed late one night. She said, "[A]t least two [men] jumped on my body and started kicking and hitting me . . ., [and] they stomped on me with their rough feet." She said the men covered her face with some kind of cloth – "like a funeral." She stopped trying to fight the men, and they bound her feet and hands. She did not see her attackers and had never met the defendant or Mr. Savage. She did, however, know Mr. Privette as her stepdaughter's husband. The victim described her two husbands as "very generous men" and said that the attackers took "[e]verything she had . . . that night." She considered herself "fortunate to have not been killed."

Joseph DeMaio, an inmate at the Montgomery County Jail, met the defendant as the defendant awaited trial. The two men became friends, and Mr. DeMaio often asked his mother to perform computer research for the defendant. Mr. DeMaio recalled the defendant's admitting his involvement in the offenses. The defendant told Mr. DeMaio that Mr. Privette told the defendant that the victim kept "gold and silver bullion" and cash in a safe at her home. The defendant admitted that he entered the victim's home and that he tied up the victim when the victim began struggling with him. After restraining the victim, the defendant telephoned Mr. Savage, who assisted in ransacking the home in search of the valuables. The defendant referred to Mr. Savage as a "chicken shit" because Mr. Savage fled the home when "Lifeline" personnel contacted the home. The defendant told Mr. DeMaio that he "thought [the victim] was in her 70's; had [he] known she was that old [he] never would have [tied her up]." The defendant also told Mr. DeMaio that he and Mr. Privette owed Mr. Savage money for methamphetamine.

The defendant testified at trial and denied ever meeting Mr. DeMaio while housed at the Montgomery County Jail or telling Mr. DeMaio anything about the offenses. He affirmed the accuracy of his 2008 statement to CPD Detective Timothy Anderson.[1] The defendant testified that he met Mr. Privette, who asked him to rob his wife's stepmother. Mr. Privette claimed the victim kept "gold bars and silver bars" in a safe in her home. Mr.

_____

[1] The defendant's statement was played for the jury during Detective Anderson's testimony during the State's case-in-chief.

Privette promised the defendant that his portion of the theft proceeds would total between $100,000 and $300,000. The defendant testified that he plotted with Mr. Privette to commit the burglary and theft because he needed the money "due to his poverty" and to support his methamphetamine addiction.

The defendant testified that he procured Mr. Savage's assistance in committing the offenses. The defendant said that he and Mr. Savage traveled to the victim's home in Clarksville. Before arriving at the home, the defendant and Mr. Savage stopped at a Walmart parking lot where they stole a license plate from a vehicle to place on the truck they were driving. At the victim's home, the defendant "jimmied" the sunroom door open and found keys where Mr. Privette told him they were kept. The defendant entered the victim's home between 10:00 and 11:00 p.m. and first located a safe in the basement where he found coins and stamps. He did not, however, find the gold, silver, and cash as promised by Mr. Privette. The defendant then telephoned Mr. Savage to join him in "going through rooms" in search of valuables.

The defendant admitted putting a pillowcase over the victim's head, but he denied beating the victim. The defendant said that Mr. Savage beat the victim while the defendant searched drawers for valuables. The defendant recalled that the victim "was calling on Jesus, and [Mr.] Savage told [the defendant] he was a[n] athiest. And that's the only reason [the defendant could] think that [Mr. Savage] hit her, or to knock her out." The defendant eventually told Mr. Savage to stop hitting the victim. When the defendant accidentally knocked the telephone to the floor, alerting the victim's "Lifeline" system, Mr. Savage became startled and ran from the home. The defendant faked his voice to assure the "Lifeline" personnel that everything was okay. He then loaded the victim's car with the stolen items and spent the night driving around in search of Mr. Savage. Unable to locate Mr. Savage, the defendant drove back to Georgia, where he abandoned the victim's car.

Walter Vaughn, an inmate in the Montgomery County Jail at the same time as the defendant and Mr. Savage, testified at trial that Mr. Savage told him details about the offenses.[2] Mr. Vaughn testified that Mr. Savage admitted tying up the victim and beating her. He also told Mr. Vaughn that the defendant disguised his voice as an elderly lady's voice to dupe the "Lifeline" personnel. According to Mr. Vaughn, Mr. Savage returned to the home sometime during the night in search of more valuables before telephoning his mother in Georgia to pick him up.

---

[2] During a jury-out hearing prior to the defendant's testifying, the defense called Mr. Savage as a witness. Mr. Savage, while represented by counsel, exercised his right against self-incrimination and elected not to testify at the defendant's trial.

With this evidence, the jury convicted the defendant of conspiracy to commit aggravated burglary, aggravated burglary, conspiracy to commit theft of property valued at over $10,000 but less that $60,000, aggravated robbery, aggravated kidnapping – all related to offenses committed against Ms. England – and theft of property valued at less than $500, related to the stolen license plate.

At the sentencing hearing, the parties agreed that the defendant qualified as a Range II, multiple offender based upon his history of criminal convictions. The defendant testified that his most serious prior conviction, vehicular homicide, arose from a high speed chase from the police during which his passenger and good friend was killed. During the same incident, the defendant suffered severe head injuries and was hospitalized in a coma for several months. After his trial in the instant case, the defendant testified against Mr. Savage in Mr. Savage's separate trial. The defendant expressed remorse to the victim and her family for the offenses.

In determining the length of the defendant's sentence, the trial court found four applicable enhancement factors: the defendant's previous history of criminal convictions, *see* T.C.A. § 40-35-114(1); the defendant's leadership role in committing the offenses as evidenced by his planning with Mr. Privette and procurement of Mr. Savage's assistance, *see id.* at § 40-35-114(2); the then 90-year-old victim's particular vulnerability due to age, *see id.* at § 40-35-114(4); and the exceptionally cruel treatment of the victim at the hands of both the defendant and Mr. Savage, *see id.* at § 40-35-114(5). The trial court gave some weight in mitigation to the defendant's assisting authorities in locating the stolen property and testifying at Mr. Savage's trial. Based upon these factors, the trial court imposed the maximum sentences for each offense.

In determining the alignment of sentences, the trial court found that the defendant had "a very extensive record of criminal activity." *See* T.C.A. § 40-35-115(b)(2). The trial court also found that the defendant was "a dangerous offender whose behavior indicates little or no regard for human life and who had no hesitation about committing a crime in which the risk to human life was high." *See* T.C.A. § 40-35-115(4). The trial court further determined that consecutive sentencing was necessary to protect the public and reasonably related to the severity of the offenses. *See State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). The court then ordered that the sentences in counts one and two be served concurrently (for an effective sentence of 10 years), and that the sentences in counts three and four be served concurrently (for an effective sentence of 20 years), but it ordered that each concurrently aligned pair be served consecutively to one another and to the 20 year sentence imposed in count five. Thus, the trial court imposed a total effective sentence of

50 years' incarceration.[3]

On appeal, the defendant argues that the trial court imposed an excessive sentence in both length and alignment of service. The State contends that the record supports the trial court's sentencing decision.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration" to the appropriate "factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Since the 2005 revisions to our sentencing act rendered enhancement and mitigating factors advisory, appellate review does not extend to the weight afforded mitigating and enhancement factors by the trial court. *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

---

[3] The trial court imposed a concurrent sentence of 11 months and 29 days for the misdemeanor theft conviction.

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

The record reflects that the trial court considered the sentencing principles and all relevant facts and circumstances in arriving at the length of sentences. Further, the trial court applied appropriate enhancement and mitigating factors. The record before this court fully supports the lengths of sentences imposed by the trial court in this case.

As to the defendant's challenge concerning the imposition of consecutive sentences, when a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so

declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). Here, the trial court concluded that the defendant fit into the second and fourth categories, that the defendant is an offender whose record of criminal activity is extensive and that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. In *Wilkerson*, the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: (1) the court must find consecutive sentences are reasonably related to the severity of the offenses committed and (2) that consecutive sentences are necessary to protect the public from further criminal conduct. *Wilkerson*, 905 S.W.2d at 937-39; *see also State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

In this case, the trial court specifically addressed both *Wilkerson* factors. Furthermore, the record supports the trial court's findings as to both factors (2) and (4).

Thus, the trial court's imposition of consecutive sentences was appropriate.

*Conclusion*

The record supports the trial court's imposition of maximum sentences for each offense and consecutive sentences. Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE